Ross & Tillinghast
EXHIBIT
B

Affordable Aerial Photography

vs.

Showroom Interiors

Deposition of:

C/R Affordable Aerial Photography

June 03, 2022

*Vol 1*



PHIPPS REPORTING

*Raising the Bar!*

C/R Affordable Aerial Photography
June 03, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:21-cv-81777

AFFORDABLE AERIAL PHOTOGRAPHY, INC.,

    Plaintiff,

vs

SHOWROOM INTERIORS, LLC d/b/a
VESTA, et al.,

    Defendants.
_____

REMOTE DEPOSITION OF
CORPORATE REPRESENTATIVE
OF AFFORDABLE AERIAL PHOTOGRAPHY
ROBERT STEVENS

VOLUME 1 (Pages 1 - 160)

Friday, June 3, 2022
10:00 a.m. - 2:01 p.m.

LOCATION:  Remote via Zoom
Vero Beach, Florida

STENOGRAPHICALLY REPORTED BY:
CINDY A. LAYER, CSR

Job No.  250562

C/R Affordable Aerial Photography
June 03, 2022

Page 2

1  APPEARANCES:   (All parties appearing via Zoom.)

2

3  ON BEHALF OF THE PLAINTIFF:

4
         SRIPLAW
5        21301 Powerline Road, Suite 100
         Boca Raton, Florida 33433
6        (561) 404-4350
         BY:  CRAIG A. WIRTH, ESQUIRE
7        Craig.wirth@sriplaw.com

8

9  ON BEHALF OF TILLINGHAST & ROSS:

10
         MATHISON WHITTLES, LLP
11       5606 PGA Boulevard, Suite 211
         Palm Beach Gardens, Florida 33418
12       (561) 624-2001
         BY:  JOHN R. WHITTLES, ESQUIRE
13       Jwhittles@mathisonwhittles.com

14
   ON BEHALF OF THE LIEBOWITZ:
15

16       COLE SCOTT & KISSANE, P.A.
         222 Lakeview Avenue, Suite 120
17       West Palm Beach, Florida 33401
         (561) 612-3459
18       BY:  JUSTIN B. LEVINE, ESQUIRE
         Justin.levine@csklegal.com
19

20

21  Also present:   Larry Ross

22

23

24

25

Page 3

1                    I N D E X

2    Robert Stevens                                           PAGE

3

4       Direct Examination by Mr. Whittles                       4

5       Cross-Examination by Mr. Levine                          75

6       Cross-Examination by Mr. Wirth                          142

7       Redirect Examination by Mr. Whittles                    143

8       Recross-Examination by Mr. Levine                       152

9       Recross-Examination by Mr. Wirth                        156

10

11   CERTIFICATE OF REPORTER                                    158

12   READ AND SIGN LETTER                                       159

13   ERRATA SHEET                                               160

14

15                    INDEX OF EXHIBITS

16   NO.            DESCRIPTION                                  ID

17   1              Complaint                                   157

18   2              Notice of Deposition                        157

19   3              Affordable's invoices                       157

20   4              Vesta contract                              157

21   5              E-mail, Bates Stamp 0000056                 157

22

23   (Stenographer's note:  All exhibits were marked

24   following the deposition upon agreement of

25   counsel.)

Page 12

```
 1        A.   Well, it's me, but recently I've been
 2   getting my son in some of the homes and getting his
 3   feet wet as far as the photography.
 4        Q.   Regarding the job that's at issue in
 5   this lawsuit, were you the one taking the pictures,
 6   or was it your son, or somebody else?
 7        A.   It was strictly me, a hundred percent,
 8   aerials, interiors, the whole ball of wax.
 9        Q.   Describe for me how you came to
10   Leibowitz on this job, or how they came to you to
11   get the pictures taken that are at issue in this
12   case.
13        A.   I actually don't recall exactly what
14   happened, but I'm 99.9 percent sure Miki Leibowitz,
15   she's always been the point person to contact me,
16   she either called me or texted me.  And it's
17   usually very short and sweet, hey, Robert, I got a
18   job for you, give me a call, or we'll set the
19   appointment.  You know, two sentences or less.  But
20   I would have to say Miki Leibowitz contacted me.
21        Q.   How does it work?  I mean, you go out
22   there, do they -- if it changes from job to job,
23   tell me, but does someone say, hey, take a picture
24   of this.  No, this angle.  Let me see what it looks
25   like, now do this one, or do they rely on you,
```

```
 1   meaning Leibowitz, to do what you think is best, or
 2   is it something else?
 3        A.   Well, in the early days I would have a
 4   lot of input from Realtors that I need to, you
 5   know -- but today's time they pretty much leave it
 6   up to me because they know I'm going to knock it
 7   out of the park.
 8             For example, if I'm shooting a dining room,
 9   I'm not just going to give them one angle.  I'm
10   going to look at the whole dining room and probably
11   shoot it from each corner of the room, because I
12   can.  That way it kind of eliminates, whoa, Robert,
13   why did you shoot it from the northeast looking out
14   towards the loggia.  I learned a long time ago,
15   just cover your bases and shoot it all, especially
16   on the important, expensive homes.
17        Q.   Okay.  Do you usually take more
18   pictures than you need and then give the client
19   what you think they want, do you show the client
20   all the pictures and they choose, or something
21   else?
22        A.   It's a little bit of everything.
23        Q.   What was it like with Leibowitz
24   generally, and then I'll ask specifically about
25   this case?
```

Page 14

 1      A.   Leibowitz, they were very easy to work
 2   with.  Very seldom was there an issue with my
 3   photography.  I would have to say I never really
 4   dealt with Andrew or Michael.  We would have small
 5   talk -- if I was doing some photography inside the
 6   house, we might have small talk, like how's the
 7   weather, but they pretty much were hands off as far
 8   as how I took the photography.
 9           When I gave the work to Leibowitz, Miki
10   would go through the files, and if something wasn't
11   done according to what the builder and the client
12   wanted, sometimes I would go back or -- but
13   generally speaking, I would give them enough photos
14   where it would eliminate any kind of issues, like
15   why didn't you take this, or, you know, we're
16   selling the kitchen too, why didn't you shoot the
17   kitchenette.
18      **Q.   Did anyone at Leibowitz either on this**
19   **job or generally in your relationship with that**
20   **company, did they tell you what the purpose of the**
21   **picture was specifically?  What was your work going**
22   **to?  What was it being used for?**
23      A.   Well, I knew the house was for sale,
24   but my job was to produce a product.  For example,
25   if the house was selling for ten million dollars, I

C/R Affordable Aerial Photography
June 03, 2022

Page 15

1   needed to show ten million dollars in my
2   photography, or -- the house I showed you on the
3   wall, the Trump house, it was listed for 125
4   million.  It was the most expensive listing in U.S.
5   history.
6          Q.   That's the one behind you?
7          A.   Yeah.  It's been on CNBC.  A Russian
8   bought it, so, of course, they ran with a story,
9   the Russian collusion on the Rachel Maddow Show.
10  But that was an expensive listing, so I had to --
11  when I start jobs, I ask them, how much is this
12  house listed for?  I just shot a house in the Bears
13  Club, 55 million dollars.  Took me three days to
14  shoot the house, but I had to show 55 million
15  dollars.  So that's my focus, you know.
16          And then I give the product to the Realtor,
17  and then from there, you know, the Realtors use the
18  photos to get the house sold.
19          Q.   So am I correct that the Realtor takes
20  your -- is it an eye?  I've heard it called like
21  your eye for photography, and what you do, and they
22  take that and they use that to get the house sold,
23  to market the house; is that a fair statement?
24          A.   That's a fair statement.
25          Q.   So the Realtor -- let me ask a more

```
 1    on when they market properties that you
 2    photographed?
 3         A.   Can you repeat the question?
 4         Q.   Sure.  Have you ever inquired of anyone
 5    at the Leibowitz firm of where your photos are
 6    going?
 7         A.   I don't know the answer to that.  I'm
 8    inclined to say no.
 9         Q.   Okay.
10         A.   Now, I do assume that they're going to
11    go on all the home search engine sites;
12    Realtor.com, the Zillows, the Trulias of the world.
13         Q.   And at that point they're available to
14    millions of people; is that correct?
15         A.   Yes.  We're trying to sell the house.
16    But the good thing about these sites, when the
17    house sells, somebody in the Leibowitz, or somebody
18    can direct all these sites to pull it down because
19    the house sold, so there's some control over that
20    process.
21         Q.   I understand you're not an attorney,
22    but what control are you expecting the Leibowitz'
23    or any other client of yours to exert over
24    Realtor.com or Zillow?  It's your expectation that
25    the person you're contracting with for the purchase
```

Page 22

```
 1   of your pictures will make these websites remove
 2   your pictures at a time certain, or am I
 3   misunderstanding that?
 4        A.   I really haven't given it that much
 5   thought.  I know that Realtor.com kind of stretches
 6   the boundaries a little bit where they post
 7   articles that just popped out of nowhere.  They do
 8   articles now, like tabloid kind of stuff, and I
 9   kind of have concerns over that.
10        Q.   Okay.  When was the last time you
11   checked to see the status of these pictures at
12   issue in this case and whether or not they are
13   still on, say, Zillow?  When was the last time you
14   looked to see if they were taken down?
15        A.   I can't answer that question.  It
16   hasn't been recently, I know that.
17        Q.   Have you ever looked?
18        A.   Have I ever looked?  Yes, I've looked.
19        Q.   If I represented to you that as of this
20   morning the pictures that you're suing all these
21   parties over are still up on Zillow as of about 45
22   minutes ago, would you have any reason to disagree
23   with me?
24        A.   No.
25        Q.   And you know that sitting here right
```

C/R Affordable Aerial Photography
June 03, 2022

Page 23

1  now I could hit control P on my computer and print
2  your pictures to a high-quality printer and do with
3  them whatever I want without any knowledge of you
4  or anyone else; fair statement?
5         A.   Fair statement.  That's kind of
6  disturbing to know because, for example, Tiger
7  Woods' ex-wife lives in the house, and what if, for
8  example, she goes on Zillow and she sees pictures
9  of the interior of her house with expensive
10 artwork, possibly, and access points, how to get
11 into the house, and she wants to have the damn
12 pictures taken down; or if she had a Picasso,
13 possibly, which I'm not saying she did, but if, for
14 example -- if Larry or the Leibowitz' decided to go
15 to Paris, France and bring a Picasso in the living
16 room, and all of a sudden a year later it's still
17 up on Zillow, Realtor.com, that would be a problem.
18      Does she have to go fly to Zillow with a
19 baseball bat to get them to take it down?  So
20 there's problems with that.  The whole idea of
21 using MLS searches, IVX feeds are to sell a house.
22 And then when the house sells, there should be some
23 kind of controls to pull the damn pictures down.
24      Q.   Is it a fair statement that you know
25 when you take these pictures that there's going to

Page 24

 1  be a level of dissemination, at least 'til the
 2  house sells, that you can't control, that people
 3  are going to see it that you don't have a
 4  relationship with; fair statement, at least until
 5  the house sells?
 6       A.  Well, my level of expectation is that
 7  the photos stay within boundaries.  They're on home
 8  search sites that can be taken down easily.
 9  They're not to be -- people are not to build
10  websites with them and memorialize my pictures on
11  websites, or trying to sell furniture, or trying to
12  promote their commerce and memorialize the photos,
13  because, again, Greg Norman could have called me,
14  hey, Robert, the photos are up of my living room,
15  please take them down.  Now I have to figure out
16  some way to help the guy out, take them down.  I
17  don't know if I got to get a team of attorneys to
18  go knock on Zillow's door.
19       Q.  You're a question ahead of me.  Have
20  you ever done anything to enforce it?  Have you
21  ever called Zillow -- and don't tell me what you
22  and your lawyers talk about.  That I'm not allowed
23  to ask you.
24       But are you aware of any enforcement actions
25  you or people at your direction have taken to tell

Page 25

```
 1   Zillow, Realtor, or any of these other websites or
 2   any other party to take this stuff down?
 3           A.   I don't know how to answer that.
 4           Q.   Sounds like the answer is no; is that
 5   correct, or that you don't remember?
 6           A.   I don't remember.  For me to make a
 7   solid statement that this has happened, I just
 8   can't answer that.
 9           Q.   Like I said at the beginning, with all
10   these questions, for me to get to question C, I
11   have to kind of recap what I think we talked about
12   in A and B, but I can't put words in your mouth, so
13   you get to tell me if I'm wrong.
14           It sounds like we agree, tell me if I'm
15   wrong, that from the period of time that the house
16   begins being marketed with your pictures, at least
17   until it's sold, you recognize that there are
18   parties that will have access, including people on
19   the Internet, parties involved with the sale,
20   people are going to have access to your pictures
21   for that period of time; fair statement?
22           A.   Fair statement.
23           Q.   Let's focus on exactly how you got
24   these pictures to Leibowitz.
25           A.   I'm sorry to interrupt you, but I also
```

Page 26

```
 1   want to bring up the fact that I found a tabloid
 2   video produced by, I believe it was the New York
 3   Post, and it was published, I believe, in April of
 4   2021, and the house had already sold.  Elin had
 5   already been living in the house.  It even said it
 6   in the article, Elin's been living in it for at
 7   least five months now.  And they ran a posting with
 8   my photos, and it showed pictures of Elin running
 9   with a kid in her arms, and the horror on her face,
10   and they had my pictures associated with that post.
11           And then they had -- if you clicked on the
12   same thing and you clicked on Tiger Woods, it
13   showed some lady with -- very endowed, and did an
14   article on his personal life.  So I believe we
15   captured the video, but if you saw it, there would
16   be no way I would want my photos associated with
17   that.  I can almost guarantee you that Elin would
18   not approve of that being posted.
19           Q.   The New York Post article, if we're
20   talking about the same one, didn't they credit
21   Realtor.com as a source of the pictures?
22           A.   And Getty.
23           Q.   Do you know how Getty is connected to
24   this, if at all?
25           A.   No.
```

Page 141

```
 1         Q.   Can you tell me how you arrived at the
 2   July 2020 publication date for these two sets of
 3   photographs?
 4         A.   That would have to be when I took the
 5   photos, or gave the photos to the Leibowitz'.
 6         Q.   You're not sure which?
 7         A.   I'm not really sure.  Or the day that
 8   the Leibowitz' actually published the photos on
 9   MLS.  One of those three.
10         Q.   Who would know the answer to that
11   question?
12         A.   Well, my stepson does the copyright,
13   so -- and the copyright office, when you fill one
14   of these out, they want to know when the first date
15   of publication was, so what month.
16         Q.   As you sit here today, you do not know
17   how those dates were chosen?
18         A.   Not without doing research on this
19   particular one and comparing the photos and
20   metadata, invoices, et cetera.  But this would be
21   pretty much a ballpark of when they were first
22   published.
23         Q.   So we would need to take the deposition
24   of your stepson to determine this?
25         A.   Yes.
```